Filed 9/28/15  In re L.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re L.A., et al., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067458 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14719) |
| v. | |
| CHRISTINA A., et al., | |
| Defendants and Appellants. | |


APPEALS from orders of the Superior Court of San Diego County, Kimberlee A.

Lagotta, Judge.  Affirmed.


Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant

and Appellant Christina A.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and

Appellant Juan B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

In this juvenile dependency action, Christina A. did not reunify with her four daughters and they were placed with the maternal grandmother, E.A. Christina appeals orders sustaining findings on supplemental petitions (Welf. & Inst. Code, § 387[1]) and removing the children from E.A.'s custody after one of the girls was sexually molested by a cousin in E.A.'s home. Christina challenges the sufficiency of the evidence to support the orders. Juan B., the father of two of the children, also failed to reunify. He appeals and joins in Christina's briefing. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Christina's daughters are now ages 12, 10, seven and five. The two oldest girls, L.A. and Karina A., are the product of her first marriage. Their father is not involved in their lives. In 2008 Christina married Juan B., the father of the two youngest girls, C.B. and B.B.

In July 2012, the San Diego County Health and Human Services Agency (Agency) received a report that the children's maternal grandfather had sexually abused his 10-year-old stepgrandson. The abuse was committed over a two-year period and occurred in the grandparents' home, where Christina and her children lived. Christina did not believe the

---

1    All further statutory references are to the Welfare and Institutions Code.

2    For convenience we take some background facts from an earlier appeal in this matter. (*In re Leticia A.* (July 22, 2013, D063361) [nonpub. opn.].)

abuse claim, and she backed her father "100 [percent]." The grandfather agreed to move out of the home, but he was there in September 2012 when the social worker visited, and the oldest girls reported he was living in the home.

The Agency took the children into protective custody. L.A. and Karina were placed together, and C.B. and B.B. were placed together, in separate foster homes. Christina asked the Agency to place the children with Juan, and it initiated an evaluation of his home through the Mexican social services agency. At some point, Juan had been deported to Mexico.

In October 2012, Christina was living with Juan in Tijuana, Baja California, Mexico. On Halloween, she took C.B. and B.B. with her to Mexico in violation of court orders. The Agency and law enforcement were unable to find them.

In November 2012, the court held a jurisdiction and disposition hearing in L.A.'s and Karina's cases. The court determined they were at substantial risk of harm and removed them from Christina's custody.

In January 2013, Christina voluntarily returned C.B. and B.B. to the Agency's custody. At their jurisdiction and disposition hearing, the court determined the children were at risk of harm and removed them from Christina's custody. The court denied her request for placement with Juan, having learned there was a warrant for him on charges

of kidnapping, sexual battery and false imprisonment of a former girlfriend in San Diego County.[3]

In August 2013, L.A. and Karina underwent forensic interviews and gave "positive disclosures of sexual abuse" by Juan. Karina reported "acts of penile vaginal penetration," but L.A. refused to give details. L.A. "reported that she had told her mother and her mother did nothing to stop the abuse." Christina told the social worker she was unsure of whether she believed the accusations.

In October 2013, the Agency filed amended petitions on behalf of the children. (§ 387.) Counts 1 and 2 of each petition alleged the grandfather's sexual abuse of his stepgrandson, that Christina failed to follow a safety plan that required the grandfather to remain out of the home, and that she had made minimal progress in her service plan "designed to teach her how to protect her children from the risks of sexual abuse." L.A.'s and Karina's petitions included counts 3 and 4, respectively, which alleged that between 2010 and late September 2012, Juan sexually abused them, and Christina "stated she did not know if she believed the . . . disclosures." C.B.'s and B.B.'s petitions included a count 5 which alleged Juan's sexual abuse of L.A. and Karina.

_____

[3] Christina appealed the jurisdiction and disposition orders and filed a petition for writ of habeas corpus, contending the juvenile court lacked subject matter jurisdiction and the children were being wrongfully detained. This court reversed the orders and remanded the matter to the juvenile court to hold a hearing on the issue of whether it had subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) when the proceedings commenced. On remand, the court found the children's home state is California, and thus it has subject matter jurisdiction.

In December 2013, the court made true findings on the amended petitions. It ordered an evaluation of E.A.'s home for placement and the continuation of reunification services for Christina and Juan.

In late summer 2014, the court held a special hearing on E.A.'s request for placement. The court determined it was in the children's best interests to be placed with her. The court ordered that E.A. not supervise Christina's or Juan's visits, and that the children not have contact with the grandfather. The court terminated reunification services and scheduled a permanency planning hearing under section 366.26.

In its assessment report, the Agency expressed concern about E.A.'s "long[-]term ability to protect the girls from the mother and [Juan]," but noted she had been protective thus far. E.A. was previously interested in adoption, but she was currently only willing to undertake a guardianship. She was hopeful that Christina "would be able to regain custody in the future."

On December 8, 2014, E.A. attended a meeting with the social worker and reported that "everything is going well in the home." On December 15, however, the Agency learned from L.A.'s therapist that on November 23, a teenage male cousin spent the night at E.A.'s home and sexually molested L.A. The cousin woke E.A. in the middle of the night and told her he had touched L.A. sexually, he was sorry, and he wanted to go home. E.A. did not check on L.A. E.A. allowed the cousin to sleep in her room, and she took him home the following morning. E.A. did not report the incident to the boy's parents or to the Agency. E.A. told L.A. she knew about the abuse, but there was no further discussion on the topic.

5

At L.A.'s next therapy session, on December 13, 2014, E.A. reported the incident to the therapist when L.A. refused to do so. At a therapy session on December 20, L.A. agreed to answer eight questions, and her answers indicated the touching was under her clothes, private parts were "sort of" involved, and there was penetration. She believed the incident was her fault. E.A. repeatedly told the therapist "she did not know what to do." The therapist "did not feel that the grandmother minimized the abuse, but had no idea how to react to the abuse and made very poor judgment in allowing her grandson to stay overnight."

The Agency was "very concerned about the continued risk of sexual abuse of all four girls." Thus, it filed supplemental petitions that alleged the placement with E.A. was no longer appropriate because of the incident with the cousin and her inability to protect the children from future harm. The girls were placed together in a foster home.

In a conversation with the social worker, E.A. explained she had still not told the boy's parents about the incident because his father was incarcerated and his mother "is such a hard woman to talk to and I haven't had time to talk to her." (Italics omitted.) E.A. said she did not report the incident to the police because "[h]e is underage" and "I didn't know I had to call them." (Italics omitted.) She said she did not immediately notify the Agency because L.A. asked her not to, and she was trying to build a relationship with L.A. and did not "want to break her trust." (Italics omitted.) "The grandmother reported that she just wasn't sure how to react in that situation." (Italics omitted.)

The Agency's jurisdiction report recommended that the girls remain in their foster home. The Agency had learned E.A. broke the rules by frequently speaking with Christina by phone and by allowing her to see the children outside of visitation and telling them "it's a secret." Further, the children "reported that during a visit with the mother and grandmother, the grandmother made a statement about wanting to die." L.A. told the foster mother that E.A. "had no rules for them and never disciplined them," and "her sisters were so out of control at grandmother's house that she felt she needed to hit them to keep them safe." Also, the grandfather was seen in E.A.'s car when she visited the children in foster care.

At the hearing on the supplemental petitions, the social worker testified that E.A. had been attending a class "specifically geared towards children who have been sexually abused," but she stopped attending a few weeks after the children were placed with her. The class leader advised the social worker that E.A. had attended long enough to know how to handle sexual abuse, and when told how E.A. responded to the cousin's abuse of L.A., the leader responded, "She should have known better." The leader was particularly frustrated that after the abuse occurred, E.A. did not check on L.A. The leader "had concerns that the grandmother was passive," an issue they had worked on.

The social worker testified "[L.A.] is diagnosed with PTSD from trauma that she's experienced, and so [it is] really concerning that [she] was just left on her own after this." The social worker explained that when the cousin reported abusing L.A., E.A. should have called the police or his mother to pick him up. E.A. went back to sleep, which put

the children at risk. Further, the following day she should have notified the social worker and tried to schedule an emergency meeting with L.A.'s therapist.

The social worker also testified L.A. wanted to live with the foster parents, because E.A. "can't discipline the girls." Karina reported feeling safe in the foster home. She constantly complained to the social worker "about grandmother not doing anything to protect her from [L.A.]." C.B. missed her grandmother but was happy in the foster home and "feels safer." B.B. wanted to return to the foster home because at her grandmother's she "could not stop hitting" and "she felt out of control."

E.A. testified she did not tell the social worker about the abuse sooner because L.A. insisted on telling her therapist first. E.A. said she considered telling the social worker earlier, but L.A. "was finally beginning to become comfortable with me," and "I was afraid I would lose her trust."

The court sustained the supplemental petitions, found by clear and convincing evidence that the previous disposition was no longer appropriate, and ordered that the children remain in foster care. The court determined E.A. was not in a position to protect the children based on her "fail[ure] to remediate the sexual assault after the fact." The court also explained E.A. was "having a very difficult time controlling the children. The children are victims of serious previous trauma, and require a higher level of care for the children to address the previous trauma."

DISCUSSION

I

*Applicable Law*

"When the Agency seeks to change the placement of a dependent child from relative care to a more restrictive placement, such as foster care, it must file a supplemental petition under section 387 . . . . [¶] Under section 387, the Agency has the burden to show by a preponderance of the evidence that the factual allegations alleged in the petition are true. If the court finds the factual allegations are true, then the court determines whether the previous disposition is no longer effective in protecting the child or whether placement with the relative is not appropriate in view of the criteria in section 361.3." (*In re H.G.* (2006) 146 Cal.App.4th 1, 10-11 (*H.G.*).)

Under section 361.3, the court shall consider numerous factors, including the best interests of the children, and the ability of the relative to "[p]rovide a safe, secure, and stable environment for the child." (§ 361.3, subds. (a)(1) & (7)(A).) "If the court finds the previous disposition is no longer effective or the placement with the relative is not appropriate, then, in a separate disposition phase, the court must determine whether removal of the child from his or her placement is required." (*H.G., supra*, 146 Cal.App.4th at p. 12.)

"We review a decision to remove a child from a relative caretaker under the substantial evidence test. [Citation.] We review the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial court's

9

findings.  [Citation.]  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]  The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order."  (*H.G., supra*, 146 Cal.App.4th at pp. 12-13.)

II

*Analysis*

Christina challenges the sufficiency of the evidence to support the court's orders. She asserts it was reasonable for E.A. to have the cousin spend the night in her home as she "had no idea there would be a problem."  Christina points to E.A.'s testimony she was aware of "grooming" in the sexual abuse context, and she did not notice any signs that the cousin was grooming any of the children, and to E.A.'s comment to the social worker that she "could not have known that [the cousin] would do this as he is a very nice boy and very religious."  Christina claims "there is no evidence [E.A.] was ordered not to permit anyone at all to spend the night."

A report by the Agency states E.A. "was told that she is not supposed to have people spending the night due to the girls' history of sexual abuse by their stepfather." The Agency concedes it is unclear from the report whether the warning was given before the incident with the cousin.  E.A. resolved the matter, however, by testifying she understood no one was supposed to spend the night in her home, but "I didn't think [the rule] would pertain to him," meaning the cousin.

10

In any event, even if E.A. cannot be faulted for the sleepover, the court could reasonably find that her conduct put the children at risk of *future* sexual abuse. In granting E.A.'s request for custody, the court noted it was of "extreme importance" that she engage in services and "understand the dynamics of sexual abuse and domestic violence," issues that have "plagued the children." Before the children were placed with her, E.A. attended a class on sexual abuse. After the placement, however, she stopped attending before she completed the class. As the Agency reported, "Clearly, this service was not effective in protecting the girls from sexual abuse."

Further, E.A. did not even check on L.A. after the cousin sexually abused her. L.A. told the social worker that she cried in her room and "felt all alone." L.A. said she believed E.A. was so "worried about what was going to happen to [the cousin] that she never asked [L.A.] how she was and never did anything about the molestation." We reject Christina's assertion that not checking on L.A. was reasonable because "[L.A.] had not wanted to talk to grandmother about the sexual abuse [by Juan] so grandmother may have thought [L.A.] would also not want to talk about this."

Additionally, E.A. allowed the cousin to stay in her home until morning. She admitted she dozed off, which gave him another opportunity to molest one or more of the children. Christina submits that putting the children in the car to take the cousin home would have been too disruptive. Christina, however, points to no evidence suggesting E.A could not have called the cousin's mother to pick him up.

Also, E.A. did not report the matter to the Agency, but left that decision up to L.A., who was then 11 years of age. We disagree with Christina's assertion E.A. "quite

11

rationally" "chose to honor [L.A.]'s request," and E.A. "exhibited a great deal of sensitivity" to L.A.

The Agency, the provider of the sexual abuse class, and even Christina and L.A., were all concerned about E.A.'s passivity. L.A. reported that E.A. "is too nice and everyone takes advantage of her," and Christina reported "that the grandmother does not like conflict and it is hard for her to assert herself." E.A. conceded she did not know how to respond to the cousin's admission of molestation.

Substantial evidence is " 'evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact.' " (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.) We conclude substantial evidence supports the court's finding that E.A. was unwilling or unable to protect the children from sexual abuse.

DISPOSITION

The orders are affirmed.


O'ROURKE, J.

WE CONCUR:


NARES, Acting P. J.


McDONALD, J.


12